IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

JOSEPH A. ROBLES,

       Plaintiff,

v.                                                           CIV 08-0438 JB/KBM

RAY SCHULTZ, et. al.,

       Defendants.

## PROPOSED FINDINGS AND RECOMMENDED DISPOSITION AND ORDER SETTING EVIDENTIARY HEARING

In this prisoner civil rights suit under 42 U.S.C. § 1983, Plaintiff Joseph Robles seeks damages for alleged excessive use of force during his arrest. *See, e.g., Docs. 1, 4, 21.* As ordered, Defendants filed a *Martinez* Report and briefing is now complete. *See Docs. 29-31, 37, 39.* Because the disposition of this matter turns on a narrow set of disputed facts, I do not recommend a resolution at this juncture. Instead, I will set an evidentiary hearing and issue a second set of proposed findings thereafter.

## I.  The Factual Dispute

Certain facts are not in dispute.  In wee hours of the morning on March 21, 2007, a 911 caller alerted the police to what looked to be a burglary in progress at

the Commercial Door and Hardware, Inc. supply yard.  Someone in a white truck
(which turned out to have been stolen from a plumbing company) was ramming
the truck into the chain-link gate surrounding a secured area of the yard.  This
someone was Plaintiff.

The disputed facts begin with the arrival of the police on the crime scene.

In his Verified Complaint[1], Plaintiff avows that he:

> was confronted by APD for an offence.  During this
> encounter one officer had me under gun point and
> ordered me to place my hands behind my back and walk
> towards him, as soon as I got near him he then slapped
> me with his hand gun.  I tried to catch myself and
> another officer kicked me in the face and the first officer
> then proceeded to kick me in the ribs.
>
> * * * * *
>
> I was transported to UNMH and diagnosed with
> broken ribs, and cuts to the eyes.  After the swelling went
> down I found out that my nose was also broken.  I still
> cough up blood and blood comes out when I blow my
> nose.

*Id.* at 4.  Elsewhere in his Complaint, he asserts that during his arrest, he

> offered absolutely no resistance as they held me at
> gunpoint following their orders to the letter.

---

[1]  In his Complaint, Robles "declare[s] under penalty of perjury that . . . the information
contained [in the Complaint] is true and correct.  28 U.S.C. Sec. 1746.  18 U.S.C. Sec. 1621."
*Doc. 1* at 10.

>           The crimes surrounding the arrest were minor
> property crimes.  At no time during the arrest were the
> officers in danger.
>           I never attempted to elude or evade totally
> submitting to them.

*Id.* at 7.  In other pleadings, Plaintiff "states that he should not have been beat up for a nonviolent crime."  *Doc. 21* at 3.

The *Martinez* Report tells quite a different version of events.  According to the responding officers, Plaintiff ran from them, hid temporarily, and had to be ordered out of hiding.  *See, e.g., Docs. 29-31* (hereinafter collectively referred to as "*Martinez Report*"), Exhs. B-D.  Defendants concede that during the course of the arrest, Plaintiff suffered lacerations and swelling to his face, but there is some dispute as to rib fractures.  *See id.,* Exh. D (Doc. 29-5 at 13-15) (photographs of Plaintiff immediately after arrest); *id.,* Exh. E (Doc. 29-6) (emergency room medical records); *Supplement to Martinez Report,* Exh H (part 3) (Doc. 31) (Dr. Emmauel's radiology report of "no evidence of recent fracture" to right ribs).  Defendants contend, however, that the force used to effectuate the arrest was justified by Plaintiff's actions described below.

In direct contravention to Plaintiff's claims of compliance and nonresistance, Defendants point to the written police reports and radio discussion, through the dispatcher, between the officers on the scene and a supervisor located elsewhere.

3

These items provide that the officers responded with force because Plaintiff

approached one of them in a menacing manner, and then resisted as he was being

taken to the ground and placed in handcuffs.  They also surmise that some of his

injuries may have been caused by ramming the gate with the truck.  *See Martinez*

*Report,* Exhs. C, A-1.[2]   One of the police reports provides:

---

[2]   The police reports were provided in written form and the dispatch discussion were
provided on an audio CD.  *See Martinez Report,* Exhs. C, A-1.  Defendants did not provide a
transcript of the CD, otherwise explain its contents, or define the police jargon it contains.  I
have listened to it in its entirety and it appears to be all of the dispatch communications from the
time of the 911 call until the ambulance took Plaintiff to the hospital.  It plainly contains other
contains conversations about other police business happening at the same time.  The CD was not
produced to Plaintiff because of prison security restrictions on receipt of such materials.
Otherwise, Plaintiff received the rest of the *Martinez* Report materials.  *See Doc. 29* at 3, n.1;
*Doc. 33* at 1.
        As far as I can tell, my transcription below contains most of the relevant portions of the
audio on the CD, and are a conversation between an officer on the scene and his Sergeant who is
located elsewhere:
        [Officer on scene:]  Hey, Sarge, just to let you know, we've got a in custody
        277/275 and criminal 38.
        [Sergeant:]  10-4.
                                    * * * * *
        [Officer on scene:]  45-year-old male, conscious, breathing, lacerations to his face.
        [Sergeant:]  10-4.
                                    * * * * *
        [Officer on scene:]  Actually, where're probably have to go into UNMH, so we are
        going to arrange some relief here soon.
        [Sergeant:]  OK, why UNMH?  What happened?
        [Officer on scene:]  Uh, we had to take him to the ground.  He decided he
        wanted to fight with us and I'm sure some of it was from rammin' the freakin' gate.
        [Sergeant:]  All right.  You need to have an FI photograph your guy.
        [Officer on scene:]  Way ahead of ya.
        [Sergeant:]  OK.

*Martinez Report,* Exh. A-1.

I observed a Hispanic Male, dressed in camouflage, run
from the bed of the truck, eastbound through the lot.
The male, Joseph Robles, hid behind a pallet of metal
frames.  I ordered Joseph to come out from behind the
pallet.  Joseph came out.  Joseph was walking toward me.
I ordered Joseph to stop and put his hands on his head.
Joseph continued to walk toward me, with his hands in
his pocket.  I ordered Joseph to stop, take his hands out
of his pockets, and place them on his head.  Joseph did
not comply.  I took hold of Joseph's right arm.  With an
armbar takedown I directed Joseph to the ground.  Once
on the ground I ordered Joseph to put his hands on his
back.  Joseph tucked his arms under his torso and began
to kick at officers.  After a short struggle Joseph was
taken into custody.

* * * * *

A FI was called to process the scene.
Albuq. Ambulance was called to the scene.
Joseph had a laceration above his left eye.  It is unknown
if it was from ramming the fence or when officers took
him to the ground.

*Id.,* Exh. C (Doc. 29-4 at 4-5) (spelling corrections supplied).

The other police report states:

Officers were dispatched to a commercial building . . . in
reference to a possible burglary in progress. . . .  Upon
arrival, officers observed a male dressed in camouflage
run from the truck into the fenced yard.  At this time, the
fence had been completely destroyed and run over by the
white truck.  Officer McElroy was first to exit his vehicle
and confront the subject as he attempted to hide beneath
the steel door frames stacked throughout the yard.  The
subject jumped to his feet and moved towards McElroy in

5

an aggressive manner despite Officer McElroy's command
to stop and show his hands.  The subject, later identified
as Joseph Robles, continued to ignore Officer McElroy
and approached closer.  After several commands were
ignored, Office McElroy used an arm-bar take-down
technique in order to secure Robles onto the ground.
Robles was extremely combative and resisted as Officer
McElroy and I struggled to place him [in] handcuffs. . . .
During the arrest, I assisted McElroy by placing my
weight over the mid section of the offender's body, using
my knee, in order to keep him secured to the ground in
order to place handcuffs on him.

*Id.* (Doc. 29-4 at 9) (spelling and punctuation corrections supplied).  From the

outset, Plaintiff has requested production of the "police 'video cam photos' from

the dash cam and belt recorder transcripts" as support for his version of the events.

Counsel for Defendants maintains that neither exist.

## II.  *Martinez* Report Procedure

Defendants request summary judgment and dismissal of the action based on

their *Martinez* Report.  One ground is procedural.

As this Court noted when it ordered the *Martinez* Report and briefing

schedule, a "*Martinez* Report may be used in a variety of contexts, including motion

for summary judgment or *sua sponte* entry of summary judgment [and when] used

for summary judgment purposes, the *pro se* plaintiff must be afforded an opportunity

to present conflicting evidence to controvert the facts set forth in the report."  *Doc.*

*25* at 5.  The order and notice specifically cites *Hall v. Bellmon,* 935 F.3d 1106 (10th Cir. 1991), *id.,* and explains that in the course of briefing, all of the "parties should submit whatever materials they consider relevant to Plaintiff's claims."  *Id.* at 8 (also citing *Hall*).

Counsel for Defendants did not submit sworn affidavits concerning the officers' conduct with Plaintiff, and I have found no authority for the proposition that the police reports are the equivalent of an affidavit.  Nevertheless, under *Hall,* the *Martinez* Report itself is considered to be an "affidavit."  Thus, to defeat dismissal of this action, Plaintiff must have a nonconclusory response to the assertions supported by the exhibits to Defendants' *Martinez* Report.[3]

Plaintiff's response to the *Martinez* Report focuses on the items he believes are missing and should be produced in support of his claims, and requests an evidentiary hearing.  It provides in full:

---

[3]  *See, e.g., Northington v. Jackson,* 973 F.2d 1518, 1521 (10th Cir. 1992) ("In this circuit we allow a court authorized report and investigation by prison officials to determine whether a pro se prisoner's allegations have any factual or legal basis. These reports are referred to as *Martinez* reports. . . .  On summary judgment, a *Martinez* report is treated like an affidavit"); *Hall v. Bellmon,* 935 F.2d 1106, 1111 (10th Cir. 1991) ("A *Martinez* report is treated like an affidavit"); *Fisher v. Mullin,* 213 Fed. App'x 698, 701-702 (10th Cir. 2007). ("We determine that the affidavits Mr. Fisher produced in opposition to the *Martinez* report failed to "set forth facts that would be admissible in evidence," because they presented only conclusory allegations.  *Hall,* 935 F.2d at 1111.  Accordingly, the district court was not required to accept them as true and they were insufficient to demonstrate that there was a disputed issue of material fact sufficient to resist summary judgment.").

> Plaintiff has asked for numerous times for belt recorder
> transcripts and dash cam photos, Defendant enclosed
> photos showing Plaintiff with gravel embedded into his
> face, but still have not produced photo's showing
> Defendant's assault.  The belt recorder would show
> Defendant's verbal abuse also show that Plaintiff yelled
> 'you don't have to do this.'  This only shows that there
> has to be a more extensive hearing to show all that is not
> being produced at this time.  Now this Plaintiff ask this
> Honorable Court for a hearing to decide what really
> happened on the morning of 3-21-07.

*Doc. 37* (spelling corrections supplied).

Defendants argue that Plaintiff's response is inadequate to create an issue of fact because it makes "absolutely no effort to address anything contained within the . . . voluminous *Martinez* Report."  *Doc. 39* at 5.  This view is too narrow.  It is well and long settled in this Circuit that specific factual allegations contained in a verified complaint cannot be ignored in the *Martinez* Report/summary judgment context.[4]  Here, the version of the events contained in the Plaintiff's verified

---

[4]  *See, e.g., Gonzalez-Liranza v. Naranjo,* 2000 WL 488476 at * 2 (10th Cir. 2000) ("When, as here, a plaintiff's complaint is based on facts within his personal knowledge and has been sworn under penalty of perjury, it is to be treated as an affidavit. . . .  We have held on numerous occasions that if the facts described in a *Martinez* report conflict with those set out in such a verified complaint, summary judgment may not be granted because such a conflict creates an issue of fact.  *See, e.g., Green v. Branson,* 108 F.3d 1296, 1302 (10th Cir. 1997); *Hayes v. Marriott,* 70 F.3d 1144, 1146 (10th Cir. 1995); *Mosier v. Maynard,* 937 F.2d 1521, 1524 (10th Cir.1991); *Hall,* 935 F.2d at 1111."); *Graham v. Van Dycke,* 2009 WL 784259 at * 2 (10th Cir. 2009) ("a prison litigant may fend off summary judgment by producing evidence conflicting with that in the *Martinez* report, or by alleging contradictory facts in a verified complaint based on personal knowledge, *see Hayes v. Marriott,* 70 F.3d 1144, 1146 (10th Cir. 1995)").

complaint and those contained in the police reports are diametrically opposed.

Thus, procedurally, Plaintiff has not failed to meet his burden and the brevity and

content of his response are not grounds to grant summary judgment.

### III.  Qualified Immunity & Excessive Force

In a recent unanimous decision, the Supreme Court overruled the familiar

two-step procedure for evaluating qualified immunity claims under *Saucier*.  *See*

*Pearson v. Callahan*, ___ U.S. ___, ___, 129 S. Ct. 808 (2009); *Saucier v.  Katz*, 533

U.S. 194 (2001).  *Saucier* mandated that courts make the qualified immunity

decision in a particular order – first determine whether a constitutional right had

been violated and, if so, only then move on to determine whether the right was

clearly established.  After *Pearson*, courts are no longer required to follow the

analysis in that sequence and can resolve whether the alleged violation is a clearly

established right first, if that is more appropriate.  *See Pearson*, 129 S. Ct. at 819-21.

Defendants begin with the clearly established prong, and argue that because

Plaintiff's assertions are "merely stated as a broad general proposition" – that is, "his

Fourth Amendment rights were violated by Defendants' use of force" – he fails to

meet his burden of defining the violation at the "appropriate level of specificity."

*Doc. 29* at 8; *see also id.* at 7 ("When a defendant asserts a qualified immunity

defense, the burden shifts to the plaintiff, who must establish that the defendant's conduct violated 'clearly established' statutory or constitutional rights").

Defendants are correct that "broad general propositions" of constitutional law are not the proper focus in deciding whether the law is clearly established. They are also correct that the proper inquiry is whether the law is such that a reasonable officer would be on notice that his conduct would be unlawful. *E.g., Saucier,* 533 U.S. at 201; *Buck v. City of Albuquerque,* 549 F.3d 1269, 1290-91 (10th Cir. 2009); *Vondrak v. City of Las Cruces,* 535 F.3d 1198, 1204 -1205 (10th Cir. 2008), *cert. denied,* 129 S. Ct. 1003 (2009); *Fogarty v. Gallegos,* 523 F.3d 1147, 1161-62 (10th Cir. 2008).

But their application of these principles to the situation here is misplaced. First, it is plain that Plaintiff is not asserting something to the effect of "the officers used excessive force during my arrest in violation of the Fourth Amendment." He is asserting a violation of the Fourth Amendment's prohibition of excessive use of force based on certain factual allegations – the crime was no longer in progress; he was complying with the officers' orders while a gun was trained on him; he was not resisting arrest; when he got close to the officers, he was pistol-whipped, kicked in the face to the point of laceration, and so violently taken to the ground that he suffered a broken rib.

10

Defendants' argument that no Fourth Amendment violation occurred is based solely on the officer's reports of the incident. *See Doc. 29* at 8-11. But when there are disputed material facts about the reasonableness of an officer's conduct in an excessive use of force situation, summary judgment on qualified immunity is inappropriate. *E.g., Mecham v. Frazier,* 500 F.3d 1200, 1203 (10th Cir. 2007) ("'Whether the officers acted reasonably, however, is a legal determination in the absence of disputed material facts.'") (quoting *Medina v. Cram,* 252 F.3d 1124, 1131 (10th Cir.2001) (emphasis omitted); *Olsen v. Layton Hills Mall,* 312 F.3d 1304, 1314 (10th Cir. 2002) ("this court will not approve summary judgment in excessive force cases – based on qualified immunity or otherwise – if the moving party has not quieted all disputed issues of material fact.") (citing *Allen v. Muskogee,* 119 F.3d 837, 840-842 (10th Cir. 1997), *cert. denied,* 522 U.S. 1138 (1998)).

Defendant's "specificity" argument not only cannot be divorced from the disputed facts, Tenth Circuit has also expressly rejected this sort of "specificity" argument in a case similar to the one here. *See Buck,* 549 F.3d at 1290-91. Ultimately then, this case requires an evidentiary hearing, but I will explain my qualified immunity analysis in detail nonetheless.

As Defendants' acknowledge,

To be established clearly, however, there is no need that "the very

> action in question [have] previously been held unlawful." *Wilson* v.
> *Layne*, 526 U. S. 603, 615 (1999).  The unconstitutionality of
> outrageous conduct obviously will be unconstitutional, this being the
> reason, as Judge Posner has said, that "[t]he easiest cases don't even
> arise." K. H. v. *Morgan*, 914 F. 2d 846, 851 (CA7 1990).  But even as
> to action less than an outrage, "officials can still be on notice that
> their conduct violates established law . . . in novel factual
> circumstances." *Hope* v. *Pelzer*, 536 U. S. 730, 741 (2002).

*Safford Unified Sch. Distr. # 1 v. Redding,* ___ S. Ct. ___, ___, 2009 WL 1789472

at*9  (6/25/09) (Souter, J., majority opinion, Slip Op. at 11).  Thus, the qualified

immunity inquiry is not "a scavenger hunt for prior cases with precisely the same

facts."  *Casey v. City of Federal Heights,* 509 F.3d 1278 (10th Cir. 2007).

The "well-established parameters" for Fourth Amendment excessive use of

force cases is the balancing test announced by the Supreme Court in *Graham* two

decades ago.  *Buck,* 549 F.3d at 1290-91.  That is, the Fourth Amendment is

violated if the force used by the officers was constitutionally "unreasonable." *E.g.,*

*Graham v. Connor,* 490 U.S. 386, 395 (1989).  The *Graham* test is objective.

Reasonableness "'must be judged from the perspective of a reasonable officer on the

scene, rather than with the 20/20 vision of hindsight.'" *Fogarty,* 523 F.3d at 1159

(quoting *Graham,* 490 U.S. at 396).  The inquiry is whether the officers' actions

were reasonable in light of all of the circumstances.  As for all of the circumstances

surrounding the arrest, courts "must pay 'careful attention' to factors such as 'the

severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers and others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Fogarty,* 523 F.3d at 1159 (quoting *Graham,* 490 U.S. at 396); *see also e.g., York v. City of Las Cruces,* 523 F.3d 1205, 1210 (10th Cir. 2008) (citing *Graham* and *Marquez v. City of Albuquerque,* 399 F.3d 1216, 1220 (10th Cir. 2005)). The Court will "also consider whether an officer's own "reckless or deliberate conduct" in connection with the arrest contributed to the need to use the force employed." *Fogarty,* 523 F.3d at 1159-60 (citing *Jiron v. City of Lakewood,* 392 F.3d 410, 415 (10th Cir. 2004), and *Medina v. Cram,* 252 F.3d 1124, 1132 (10th Cir. 2001)).

In the Tenth Circuit, "when an officer's violation of the Fourth Amendment is particularly clear from *Graham* itself, we do not require [other decisions] with greater specificity to clearly establish the law." *Casey,* 509 F.3d a 1284; *see also Fogarty,* 523 F.3d at 1161. The conduct complained of here occurred in 2007. In dealing with conduct that occurred in 2003, the Tenth Circuit has indicated in several decisions that if force with painful consequences is used at the time when an arrestee is not attempting to flee, not actively resisting arrest, and not posing a threat, the officers are not entitled to qualified immunity. *See Buck,* 549 F.3d at 1290-91 (and earlier cases pre-dating 2007 cited therein); *Fogarty,* 523 F.3d at

1161-62 (same); *Casey*, 509 F.3d at 1284-85 (same).  That is so because "*Graham* establishes that force is least justified against nonviolent misdemeanants who do not flee or actively resist arrest."  *Casey*, 509 F.3d at 1285.

It is true that *Buck, Fogarty*, and *Casey* all involved misdemeanor charges.  In *Buck* and *Fogarty* it was use of teargas, pepper spray, and nonlethal projectiles on antiwar protestors charged with misdemeanor crimes such as resisting, evading, obstructing an officer, and public nuisance.  In *Casey* it was using an arm-lock, tackling, and Tasering by another officer on person who was taking a court file back into a courthouse and never told he was being placed under arrest.  However, the "severity of the crime at issue" does not merely refer to whether the charge was a misdemeanor or felony.   Indeed, limiting the inquiry to that legal dichotomy would directly contradict the direction to consider all of the circumstances.

The Tenth Circuit cases indicate that what is particularly relevant is how the crime was committed, whether it was committed in a violent manner, what the arrestee was doing at the point when the use of force was initiated by the officer, which party was the aggressor, and whether to officer gave the person "a chance to submit peacefully to an arrest."  *Casey*, 509 F.3d at 1282; *see also id.* at 1281-83. Consistent with this approach, one court focused on whether a burglary in progress

was "violent."[5]  Here, the violence Plaintiff directed toward the fence was done

with the truck and it appears that he had exited the truck by the time the officers

arrived on the scene.

　　　According to Plaintiff, his attempted crime had ended and he was fully

compliant and not posing a threat when he was accosted.  Yet the Tenth Circuit

has not gone so far to say that gratuitous force is excessive as a matter of law.

> [In *Holland*] [w]e held the officers' conduct violated
> plaintiffs' Fourth Amendment rights, explaining that the
> unwarranted nature of the force, rather than its potential
> for physical harm, was what rendered it
> unconstitutionally excessive.
>
> > Where a person has submitted to the
> > officers' show of force without resistance,
> > and where an officer has no reasonable cause
> > to believe that person poses a danger to the
> > officer or to others, it may be excessive and
> > unreasonable to continue to aim a loaded
> > firearm directly at that person, in contrast to
> > simply holding the weapon in a fashion ready
> > for immediate use.

---

[5]  *See Beaver v. City of Federal Way*, 507 F. Supp. 2d 1137, 1144 (W. D. Wash. 2007)
("Mr. Beaver was suspected of having committed residential burglary. Although burglary is a
felony offense, it is not necessarily a violent crime. . . .  The Court recognizes that the
dispatcher's report was not conclusive as to whether Mr. Beaver was armed, and also recognizes
that tools often used in a burglary, such as screwdrivers or hammers, can serve a dual purpose as
a weapon.  Nevertheless, the fact that Mr. Beaver was initially reported as fleeing a burglary
without weapons, as opposed to a suspect fleeing a shooting or an assault, lessens the overall
sense of danger surrounding the incident.").

* * * * *

This is not the "push or shove" case warned about in Graham.  Grass indisputably cooperated in the course of being handcuffed and placed in the patrol car.  If we accept his version of the facts as true, Johnson's use of force came after Grass was subdued and not posing a threat to anyone.  *At least one circuit has held that any force used under those circumstances is excessive as a matter of law.*  Baker v. City of Hamilton, 471 F.3d 601, 607 (6th Cir. 2006) ("We have held repeatedly that the use of force after a suspect has been incapacitated or neutralized is excessive as a matter of law."); *see also Fontana v. Haskin,* 262 F.3d 871, 880 (9th Cir. 2001) ("Gratuitous and completely unnecessary acts of violence by the police during a seizure violate the Fourth Amendment.").  *We have not yet issued such a pronouncement.*  But we have consistently factored into the totality-of-the-circumstances analysis the level of the plaintiff's resistance or cooperation during the course of the arrest.  *See, e.g., Cortez,* 478 F.3d at 1128 (stating there was "no indication . . . [plaintiff] actively resisted seizure or attempted to evade seizure by flight"); *Weigel,* 544 F.3d at 1153 (noting that officer subjected plaintiff to force "unnecessary to restrain him"); *Buck,* 549 F .3d at 1289-90 (questioning officers' use of pepper balls on plaintiff who was neither resisting nor evading arrest).  Despite the de minimis nature of Grass's injuries, a review of the facts in the light most favorable to him gives rise to a jury question regarding whether Johnson acted reasonably. The district court therefore erred in rejecting his claim as a matter of law.

*Grass v. Johnson,* 2009 WL 997346 at * 4 (10th Cir. 2009) (emphasis added).  On the other hand, as the above Tenth Circuit cases and other decisions indicate,

when the force occurs after compliance[6] or where, as here under Plaintiff's version

of the incident, each of three *Graham* factors "counsel[] against the use of a large

amount of force," *Buck,* 549 at 1291, the law is considered to be clearly established

and qualified immunity is not available.

## IV.  Dismissal Of Defendant Schultz

I previously denied an earlier motion to dismiss Defendant Police Chief Ray

Schultz, but did so without prejudice.  I noted that the allegations against him were

conclusory and amounted to nothing more than an assertion of vicarious (or

*respondeat superior*) liability simply because of his supervisory status which has been

long established as insufficient to impose § 1983 liability.  Instead, supervisors can

---

[6]  *See Fogarty,* 523 F.3d at 1162 ("it would be apparent to a reasonable officer that the use of force adequate to tear a tendon is unreasonable against a fully restrained arrestee.") (citing *Smith v. Mattox,* 127 F.3d  1416, 1419 (11th Cir. 1997)); *Walker v. City of Riviera Beach,* 212 Fed. App'x 835, 839 (11th Cir. 2006) ("we accept that Officer Patterson's supposed conduct is obviously unconstitutional, notwithstanding the lack of precedent.  Officer Patterson first pursued Walker for speeding, and Walker did not immediately pull over when Officer Patterson flashed his lights and shouted for Walker to yield.  Walker eventually pulled into a parking lot, and Officer Patterson approached the vehicle on foot with gun drawn.  Walker turned off the car and did not resist arrest or attempt to flee again.  Nevertheless, Officer Patterson unnecessarily 'slammed' his pistol into Walker's head.  Viewing the evidence in the light most favorable to Walker, 'no particularized preexisting case law was necessary for it to be clearly established that what [Officer Patterson] did violated [Walker's] constitutional right to be free from the excessive use of force.' . . .  Such an unwarranted pistol whip lies at the core of what the Fourth Amendment prohibits."); *Chidester v. Utah County,* 268 Fed. App'x 718, 729 (10th Cir. 2008) ("It is also clearly established that a law enforcement officer may not use force on a compliant suspect already under the officer's control and not resisting detention or trying to flee") (citing *Olsen v. Laytoh Hills Mall,* 312 F.3d 1304, 1314-15 (10th Cir. 2002), *Dixon v. Richer,* 922 F.2d 1456, 1462-63 (10th Cir. 1991), and *Baker v. City of Hamilton,* 471 F.3d 601, 607 (6th Cir. 2006)).

only be held liable for their own unconstitutional conduct. *See Doc. 25* at 2-4 (and cases cited therein); *see also Doc. 29* at 11-13.[7] There are no such assertions made by Plaintiff and the *Martinez* Report indicates no personal involvement by Defendant Schultz – he should now be dismissed as a party.

## V.  Evidentiary Hearing

To resolve the qualified immunity issue, it is necessary to resolve the factual disputes surrounding the arrest. I find it is appropriate to hold an evidentiary hearing for that purpose. *See Northington,* 973 F.2d at 1521 ("In this circuit we allow a court authorized report and investigation by prison officials to determine whether a pro se prisoner's allegations have any factual or legal basis. These reports are referred to as *Martinez* reports. . . .  And telephonic evidentiary hearings, such the hearings conducted by the magistrate in this case, may serve the same purpose."); *see also, e.g., Wilson v. Ulibarri,* CIV 08-852 JCH/RLP (Doc. 29 – evidentiary hearing before resolution of *Martinez* Report).

---

[7] Contrary to Defendants' suggestion, the Supreme Court did not recently establish this proposition of law in *Ashcroft v. Iqbal,* ___ U.S. ___, ___, 129 S. Ct. 1937, 1948 (2009). *See Doc. 39* at 6-7. As evidenced by the citations in that opinion, the prohibition against vicarious liability for officials has been established for centuries. *See also, e.g., Buck,* 549 F.3d at 1287, 1291. The *Iqbal* decision addresses the issue of sufficiency of pleading a "policy" theory against officials after *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544 (2007) in a counseled case, and, for the purposes of this action, at most, supports the notion that Defendant Schultz should have been dismissed long before the *Martinez* Report stage.

There is no constitutional right to counsel in civil cases, and I find counsel is not warranted as  I have already set forth the legal framework above and the narrow factual issues only involve Plaintiff and the two arresting officers.  *E.g., MacCuish v. United States,* 844 F.2d 733, 735 (10th Cir. 1988) ("the right to counsel in a civil case is not a matter of constitutional right under the Sixth Amendment" (internal quotation marks and citation omitted); Avery v. Anderson  94 Fed. App'x 735, 739-40 (10th Cir. 2004) ("The district court did not err in holding no constitutional right to counsel exists for prisoners alleging civil rights violations, *see Durre v. Dempsey,* 869 F.2d 543, 547 (10th Cir. 1989), and that 28 U.S.C. § 1915(e)(1) permits a district court to appoint counsel only if it deems it appropriate. In making this determination, the court considers 'the merits of the litigant's claims, the nature of the factual issues raised in the claims, the litigant's ability to present his claims, and the complexity of the legal issues raised by the claims.'") (quoting *Rucks v. Boergermann,* 57 F.3d 978, 979 (10th Cir. 1995)).

Counsel for Defendants asserts in the reply that "belt recorder" audio and "dash cam" video are "materials that do not exist."  *Doc. 39* at 1.  It is true that attorneys are officers of the Court, and I do not doubt the veracity of the assertion. Nevertheless, it is not properly supported by an affidavit of a person with knowledge of police procedures generally, the procedures employed by the officers

on the scene, the type of devices they had available to them, or the content of any of the devices.  Thus, I request that Defendants conduct another search for these materials.  If the materials exist in any form, Defendants shall bring them to the hearing for admission, where the Court and Plaintiff can view or hear them.  In addition, Defendants shall make a transcript of the these materials and Exhibit A-1.  The translation should include definitions of police jargon by the affidavit of a competent person.  If on the other hand these materials do not exist, Defendants shall be prepared to establish that fact at the evidentiary hearing by either testimony under oath or an affidavit by a person with the requisite personal knowledge described above.

Wherefore,

IT IS HEREBY RECOMMENDED that the presiding district judge dismiss with prejudice Defendant Schultz, but no disposition be made on the *Martinez* Report at this juncture.

IT IS HEREBY ORDERED AS FOLLOWS:

1. An evidentiary hearing will be set in Las Cruces and be held in approximately two months from the entry of this Order;

2. The Court requires the presence of Plaintiff Joseph Robles and Defendants are responsible for his transport to and from the hearing;

3. The parties may file any written submissions one month before the hearing; and

4.  Defendants are responsible for the "belt recorder" audio and "dash cam" video consistent with the discussion above.

THE PARTIES ARE FURTHER NOTIFIED THAT WITHIN 10 DAYS OF SERVICE of a copy of these Proposed Findings and Recommended Disposition they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1).  A party must file any objections with the Clerk of the District Court within the ten-day period if that party wants to have appellate review of the proposed findings and recommended disposition.  If no objections are filed, no appellate review will be allowed.

_____
UNITED STATES MAGISTRATE JUDGE